UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY<br><br>Plaintiff,<br><br>v.<br><br>ALSTOM POWER, INC. AND WISCONSIN ELECTRIC POWER COMPANY,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR<br>DECLARATORY JUDGMENT**<br><br>JUNE 29, 2015 |

Plaintiff, Zurich American Insurance Company ("Zurich"), by way of Complaint for Declaratory Judgment against Defendants, Alstom Power, Inc. ("Alstom Power"), and Wisconsin Electric Power Company ("WEPCO"), alleges and says:

## INTRODUCTION

1. This action is brought pursuant to 28 U.S.C. §2201 and §2202 for a declaratory judgment to determine the respective rights and obligations of the parties under certain commercial general liability insurance policies issued by Zurich to Alstom Power.

2. Alstom Power provided notice to Zurich of a "Demand for Arbitration Before JAMS" that was served upon Alstom Power by WEPCO (the "Underlying Arbitration").

3. Alstom Power has demanded that Zurich defend and potentially indemnify it in the Underlying Arbitration under certain policies of insurance issued to it by Zurich.

1

4. Zurich has disclaimed any duty to defend or to indemnify Alstom Power in the Underlying Arbitration.

5. The claims in the Underlying Arbitration have given rise, and likely will continue to give rise, to disputes among the parties regarding the issue whether Alstom Power is entitled to liability coverage in the Underlying Arbitration under the insurance policies issued to Alstom Power by Zurich.

## THE PARTIES

6. Plaintiff Zurich is a corporation organized under the laws of the State of New York and engaged in the insurance business with a statutory home office located at One Liberty Plaza, 165 Broadway, 32nd Floor, New York, New York 10006, and a principal place of business located at 1400 American Lane, Schaumburg, Illinois 60196.

7. Upon information and belief, Defendant Alstom Power is a corporation organized under the laws of the State of Connecticut with a principal place of business located at 200 Great Pond Drive, Windsor, Connecticut 06095.

8. Upon information and belief, WEPCO is a corporation organized under the laws of the State of Wisconsin with a principal place of business located at 231 West Michigan Street, Milwaukee, Wisconsin 53201.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, §2201 and §2202 because: (i) there is an actual controversy between the parties; (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (iii) the matter is between citizens of different states.

10.     Venue is proper under 28 U.S.C. §1391 because this is the judicial district in which Defendant Alstom Power resides, and a substantial part of the events giving rise to the claim occurred in this district.

## NATURE OF DISPUTE

### The Underlying Arbitration

11.     The Underlying Arbitration arises out of the issuance of two Purchase Orders to Alstom Power by W.E. Power, LLC, for four Heat Recovery Steam Generators ("HRSG's") and associated equipment for the Block 1 and the Block 2 of the Port Washington Generating Station ("PWGS").

12.     In the Underlying Arbitration, WEPCO alleges that on August 1, 2002, W.E. Power, LLC, issued Purchase Order 4500495842 to Alstom Power for two HRSG's and associated equipment for the Block 2 of the PWGS at a purchase price of $25,246,780.00. WEPCO alleges that Alstom Power accepted this Purchase Order.

13.     In the Underlying Arbitration, WEPCO alleges that on November 6, 2003, W.E. Power, LLC, issued Purchase Order 4500591774 to Alstom Power for two HRSG's and associated equipment for the Block 1 of the PWGS at a purchase price of $23,595,000.00. WEPCO alleges that Alstom Power accepted this Purchase Order.

14.     In the Underlying Arbitration, WEPCO alleges that the Purchase Orders, which WEPCO refers to as the Contract, provided that Alstom Power "warrants that all Equipment furnished hereunder shall be new when delivered, unused and free from defects in design, engineering, material and workmanship, shall conform to the requirements of the Specifications and Design Documents, shall be of the quality to meet the requirements of this Purchase Order and meet or excess industry standards for 24

months after the date on which Substantial Completion is achieved or forty-eight (48) months following Installation-Ready Delivery, whichever first occurs (Warranty.).

15. In the Underlying Arbitration, WEPCO alleges that the Contract provides that if Alstom Power does not begin action to correct a non-conformity in the Equipment, WEPCO may correct the non-conformity and backcharge Alstom Power for the cost of same.

16. In the Underlying Arbitration, WEPCO alleges that the Contract provides that in the event any Work performed by Alstom Power is not performed in accordance with accepted standards and in accordance of the requirements of this Purchase Order, such work shall be corrected by Alstom Power at no cost to WEPCO. WEPCO further alleges that, pursuant to the terms of the contract, if deficiencies are not corrected by Alstom Power when and as necessary to meet WEPCO's requirements, WEPCO may correct such deficiencies at Alstom Power's expense.

17. In the Underlying Arbitration, WEPCO alleges that, pursuant to the provisions of the Contract, where Alstom Power is notified in writing by WEPCO to correct defective Work and Alstom Power states or by its actions indicates that it is unable or unwilling to do so, WEPCO may upon written notice accomplish the required redesign, repair, rework or replacement of non-conforming Work by the most expeditious means available and backcharge Alstom Power for the costs incurred.

18. In the Underlying Arbitration, WEPCO further alleges that the Contract provides that prior to the completion of the Work, backcharge costs will be treated as a Purchase Order Price Adjustment.

19. In the Underlying Arbitration, WEPCO alleges that in July 2005, Block 2 was substantially completed and HRSG Units 21 and 22 were placed into commercial service. Thereafter, it is alleged that in April 2006, WEPCO discovered substantial cracking in the manifold link piping on HRSG Units 21 and 22.

20. In the Underlying Arbitration, WEPCO alleges that on April 10, 2006, it provided written notice to Alstom Power of its warranty claim for the cracks in the Block 2 HRSG's. Thereafter, on April 12, 2006, WEPCO submitted its formal warranty claim to Alstom Power.

21. In the Underlying Arbitration, WEPCO alleges that over the next several years following its submission of its formal warranty claim to Alstom Power, it complied with Alstom Power's repeated requests for data and recommendations regarding the placement of thermal couples, control logic adjustments and providing data for Alstom Power's review as to the HRSG Block 2 defects.

22. In the Underlying Arbitration, WEPCO alleges that in May 2008, Block 1 was substantially completed and HRSG Units 11 and 12 were placed into commercial service. Thereafter, it is alleged that in November 2008, WEPCO discovered cracks on the manifold link piping in Block 1.

23. In the Underlying Arbitration, WEPCO alleges that on November 15, 2008, WEPCO emailed Alstom Power regarding the cracks on the manifold link piping, thereby putting Alstom Power on notice of WEPCO's claim as to the Block 1 HRSG's.

24. In the Underlying Arbitration, WEPCO alleges that on November 28, 2008, WEPCO warranty claim identified cracks found on Block 1 HRSG Unit 11.

Thereafter, on December 13, 2008, WEPCO submitted its formal Block 1 warranty claim to Alstom Power.

25.     In the Underlying Arbitration, WEPCO alleges that over the next several years, it complied with Alstom Power's repeated requests for data and recommendations regarding the replacement of thermal couples, control logic adjustments and providing data for Alstom Power's review as to the HRSG Block 1 defects.

26.     In the Underlying Arbitration, WEPCO alleges that Alstom Power's design of the connecting piping upstream of the manifolds of the Block 2 and Block 1 HRSG's is defective and it is this defective design that caused the cracking.

27.     In the Underlying Arbitration, WEPCO alleges that despite having provided Alstom power with voluminous information and data, Alstom Power has failed to provide an answer or a solution to the HRSG's defects.  Moreover, WEPCO alleges that as to each Block's HRSG cracking, Alstom Power knew that its HRSG's contained design defects.

28.     In the Underlying Arbitration, WEPCO alleges that on November 19, 2013, it submitted notice of claim to Alstom Power and formally invoked the Contracts Dispute Resolution process.  Thereafter, WEPCO alleges that Alstom Power refused to propose and/or pay for repair or replacement of the defective desuperheaters and moreover, it refused to propose a redesign or redesign WEPCO's units.  As such, WEPCO alleges that it undertook to replace the desuperheaters and piping with redesigned components.

29. In the Underlying Arbitration, WEPCO alleges three causes of action against Alstom Power: Claim I alleges liability for backcharges; Claim II alleges breach of warranty; and Claim III alleges breach of the duty of good faith and fair dealing.

30. In the Underlying Arbitration, WEPCO seeks damages for the costs of the redesign and repair work; the costs incurred in connection with the annual crack repair; the finite element analysis performed by HRST; and the costs incurred in a forced outage that occurred in 2010. It is alleged that these damages directly resulted from Alstom Powers many breaches of the Contract.

31. WEPCO's Arbitration Demand in the Underlying Arbitration includes a Damages Summary pursuant to which WEPCO seeks to recover repair, replacement, outage and backup charges totaling $15,034,857.82. In addition, WEPCO seeks to recover the costs of the arbitration including attorney's fees.

## THE ZURICH INSURANCE POLICIES

32. Zurich issued to Alstom Power a Commercial General Liability policy of insurance bearing policy number GLO 8377004 for consecutive annual policy periods from December 31, 2004 to April 1, 2009, as follows: GLO 8377004-02 (12/31/04 – 4/1/06); GLO 8377004-03 (4/1/06 – 4/1/07); GLO 8377004-04 (4/1/07 – 4/1/08); and GLO 8377004-05 (4/1/08 – 4/1/09) (collectively, the "Zurich policies").

33. The Zurich policies provide limits of liability as follows: GLO 8377004-02 -- $2 million each occurrence and $5 million aggregate limit; GLO 8377004-03 -- $2.5 million each occurrence and $5 million aggregate; GLO 8377004-04 -- $2.5 million each occurrence and $5 million aggregate; and GLO 8377004-05 -- $3 million each occurrence and $5 million aggregate limit.

34. The Insuring Agreement in the Zurich policies regarding Coverage A – Bodily Injury and Property Damage Liability, provides, in relevant part, as follows:

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. Of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the police period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

35. Section V. **DEFINITIONS** of the Zurich policies contains the following relevant definitions:

9. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

8

a. It incorporates "your product" or "your work" that is know or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

18. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physical injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

22. "Your product":

a. Means:

(1) Any gods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

       (2)    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b.    Includes

       (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

       (2)    The providing of or failure to provide warnings or instructions.

   c.    Does not include vending machines or other property rented to or located for the use of others but not sold.

23.    "Your work"

   a.    Means:

       (1)    Work or operations performed by you or on your behalf; and

       (2)    Materials, parts or equipment furnished in connection with such work or operations.

   b.    Includes

       (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

       (2)    The providing of or failure to provide warnings or instructions.

36.    The Zurich policies contain the following pertinent exclusions applicable to Coverage A:

   **2.**    **Exclusions**

       This insurance does not apply to:

   **k.**    **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

37. The Zurich policies, with the exception of policy GLO 8377004-01, have been endorsed to include the following exclusion:

**LIMITED EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABLITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and

11

Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services you, but only with respect to your providing engineering, architectural or surveying services in your capacity as an engineer, architect or surveyor.

Professional services include:

1. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

2. Supervisory or inspection activities performed a party of any related architectural or engineering activities.

This exclusion does not apply to your operations in connection with construction work performed by you or on your behalf.

38. The CONDITIONS section of the Zurich policies provides, in relevant part, as follows:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

   a. You must see to it that we are notified as soon as practicable or an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;
      (2) The names and addresses of any injured persons and witnesses; and
      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

    (1) Immediately record the specifics of the claim or "suit" as soon as practicable.

  c. You and any other involved insured must:

    (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

39. The notice provision contained in the Zurich policies has been endorsed as follows:

**Knowledge of Occurrence Endorsement**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

1. The Duties In The Event Of Accident, Occurrence, Offense, Injury, Claim Or Suit condition is amended per the following:

  It is agreed that knowledge of an "accident", "occurrence", offense, "injury", claim, or "suit" by your agent, servant or "employee" will not in itself be considered to be your knowledge of the "accident", "occurrence", offense, "injury" claim, or suit" unless the individual(s) in the following position(s) or department shall have received such notice from the agent, servant or "employee":

  Position or Department:

  Knowledge by any person in the Risk Management Department, the Law Department or any executive that is responsible for receiving or acting upon said information

2. If a claim is made or "suit" is brought against any insured, you or the individual(s) in the Position or Department above must:

  a. Immediately record the specifics of the claim or "suit" and the date received; and

  b. Notify us and see that we receive written notice of the claim or "suit" as soon as practicable.

## TENDER/NOTICE

40. Alstom Power tendered WEPCO's Demand for Arbitration to Zurich and demanded defense and indemnity with respect to the Underlying Arbitration under the Zurich policies.

41. By letter dated April 16, 2015, Zurich advised Alstom Power that the Zurich policies did not provide coverage to Alstom Power in connection with WEPCO's Demand for Arbitration and therefore, Zurich was declining defense and indemnification in connection with WEPCO's Demand for Arbitration.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Declaratory Judgment as to the Zurich Policies)

42. Zurich repeats and realleges all allegations of the Complaint as if set forth at length herein.

43. In relevant part, Coverage A of the Zurich policies affords coverage for "property damage" resulting from an "occurrence". In the Underlying Arbitration, WEPCO does not allege "property damage" caused by an "occurrence." Therefore, the Zurich policies do not provide coverage to Alstom Power in connection with the claims asserted against it by WEPCO in the Underlying Arbitration.

44. The Zurich policies include Exclusion k., entitled "Damage to Your Product," which excludes coverage for damage to "your product" arising out of it and any part of it. To the extent WEPCO alleges in the Underlying Arbitration that the HRSG's were "your product," coverage for WEPCO's claims for costs associated with the investigation and repairs to the HRSG's is excluded.

45. The Zurich policies include Exclusion l., entitled "Damage to Your Work," which excludes coverage for "property damage" to "your work" that falls within the "products-completed operations hazard." To the extent that WEPCO seeks to recover the costs of the investigation and repair of the cracks to the HRSG's, coverage is barred by Exclusion l.

46. Because the claims asserted against Alstom Power by WEPCO arise out of Alstom Power's allegedly defective design, coverage is barred under the Zurich policies based upon the policies' "Limited Exclusion—Contractors—Professional Liability" endorsement.

47. Based upon the allegations contained in the Underlying Arbitration, Alstom Power had notice of WEPCO's warranty claims involving cracking of the HRSGs as early as April 2006. To the extent Alstom Power had notice of said warranty claims at this time, coverage under the Zurich policies is barred pursuant to the "known loss" provisions of the Insuring Agreement and under any Zurich policy where the Zurich policy had incepted subsequent to the known loss date.

48. To the extent that Alstom Power breached the notice provisions contained in the Zurich policies in that Zurich's first notice of claim was on October 31, 2014, coverage is barred.

49. The Zurich policies contain an "Impaired Property" exclusion which provides, in relevant part, that coverage is excluded for "property damage" to "impaired property" arising out of a defect, deficiency, inadequacy or dangerous condition and "your product" or "your work", or a delay or failure by you or anyone acting on your

behalf to perform a contract or agreement in accordance with its terms. To the extent the facts alleged in the Underlying Arbitration, fall within this exclusion, coverage is barred.

50.    To the extent WEPCO's Arbitration Demand alleges property damage caused by an occurrence, property damage that did not occur during one or more of the policy periods of the Zurich policies is not covered.

51.    By reason of the foregoing an actual and justiciable controversy exists between Zurich and the defendants, Alstom Power and WEPCO. Zurich therefore seeks a declaratory judgment that it owes no duty to defend or to indemnify Alstom Power in the Underlying Arbitration.

**WHEREFORE**, Zurich requests the Court enter judgment as follows:

1. Declaring that Zurich does not have a duty to defend or indemnify Alstom Power under the Zurich policies for the claims asserted against Alstom Power in the Underlying Arbitration; and

2. For such other and further relief as the Court deems just and proper.

*Attorney for Plaintiff*
*Zurich American Insurance Company*

By: _____
Daniel P. Scapellati, Esq.
Federal Bar No. CT03855
HALLORAN & SAGE, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
scapellati@halloransage.com
(860)522-6103 – phone
(860)548-0006 - fax

Dated: June 29, 2015

3834255v.1